UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMESURF, INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTUIT INC.,<br><br>Defendant. | Case No.:  3:22-cv-412-RSH-DDL<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT; AND**<br><br>[ECF No. 253]<br><br>**(2) DENYING AS MOOT THE PARTIES' *DAUBERT* MOTIONS, MOTIONS IN LIMINE, AND MOTION FOR POTENTIAL TRIAL DATES**<br><br>[ECF Nos. 240, 243, 246, 247, 250, 266, 317, 323, 326, 327, 328, 329, 330, 332, 335, 336, 337, 338, 341] |

On February 20, 2026, Defendant Intuit Inc. ("Intuit") filed a motion for summary judgment of non-infringement of the only remaining Asserted Patent in this action, U.S. Patent No. 9,483,448 ("the '448 Patent"). ECF No. 253. On March 20, 2026, Plaintiff Samesurf, Inc. ("Samesurf") filed a response in opposition to Intuit's motion for summary judgment. ECF No. 281. On April 3, 2026, Intuit filed a reply. ECF No. 300. On April 3, 2026, the Parties filed their joint statement of undisputed material facts. ECF No. 303.

For the reasons below, the Court grants Intuit's motion for summary judgment of non-infringement.

## I.   BACKGROUND

The '448 Patent is the sole remaining Asserted Patent in this action. *See id.*; ECF No. 61-1 at 5; ECF No. 64 at 4. Samesurf asserts Claims 1, 2, 5–9, and 11–15 of the '448 Patent against Intuit. ECF No. 302 ¶ 2.

### A.   The Asserted Patent – The '448 Patent

The '448 Patent is entitled "Method and Apparatus for the Implementation of a Real-time, Sharable Browsing Experience on a Host Device," and was issued on November 1, 2016.  The patent describes a system and method to allow "two or more persons browsing the internet to share their internet browsing experience and have all users simultaneously browse and fully interact with web sites, games, virtual worlds, or other online applications in real time." '449 Patent at col. 5 ll. 22–26.

As background, the specification of the '448 Patent explains:

> While the explosion of social media has allowed people to be connected on the internet more than ever before, browsing the internet has remained a largely solitary experience. Users of social media websites or applications communicate by taking turns, posting information rather than communicating with one another in real time. . . .

> Despite the obvious demand for socialization on the internet and despite the desire of many users to utilize the web to view online content with others in real-time, there is no effective, fully interactive modality that enables a group of users to view and interact with internet content and media simultaneously with others on different computers or other

connected devices with all of those users empowered to interact with that content in real-time on a simultaneous basis.

*Id.* at col. 1 l. 47 to col. 2 l. 21.

The specification then describes some of the specific problems with "screen sharing," *see id.* at col. 3 ll. 26–44, and states: "the current art lacks technology that would simultaneously connect two or more users in a medium that would allow all of them to both interact with one another and with the content itself in real time and in a synchronized or shared fashion," *id.* at col. 2 ll. 8-12. *See also id.* at col. 3 ll. 45–48 ("There is a need in the art for an internet enabled collaboration, online commerce, and social networking innovation that facilitates real time sharing of a more complete internet experience.").

In order "[t]o minimize the limitations in the prior art," the '448 Patent discloses "a method for establishing a synchronized browsing session, comprising sending a request to establish the synchronized browsing session to a synchronization server, receiving a confirmation message from the synchronization server including a session identifier associated with the established synchronized browsing session, and sending an invitation to an invitee to join the synchronized browsing session, wherein the invitation includes the session identifier." *Id.* at col. 2 l. 59 to col. 3 l. 3. The specification then explains what constitutes a synchronized browsing session, providing: "In a synchronized browsing session, two or more people may read the same article, watch the same video, or shop for the same item automatically, without the hassle of coordinating user input." *Id.* at col. 5 ll. 3–33.

The specification gives the following example to distinguish the synchronized browsing session disclosed in the specification from the relevant prior art.

> In the current art, should two or more people, on different devices, attempt to book an airline flight through an internet website, each person would be separately required to input identical information such as destination, date of departure, or date of arrival into their respective browser. Coordination of such data input is often difficult to accomplish and input errors can lead to conflicting search results. In a synchronized

3

browsing session utilizing the present invention, however, such data input is automatically formatted, forwarded and inputted into the other devices, thereby allowing all persons to view, book, and alter the same flight results. Further activities may include, but are not limited to, enabling session attendees to shop, book travel, view or listen to media, chat, audio and video conference, screen share, screen draw, stay connected to contacts in order to send invites and chat with those not currently in the experience, detect online friends, and otherwise browse and fully interact in a shared browsing experience. As such, utilization of the present invention facilitates the initialization and implementation of a synchronized browsing session between two or more internet users, thereby allowing all of them to view and fully interact with the same internet content without the hassle of coordinated user input.

*Id.* at col. 5 ll. 38–61; *see also id.* at col. 5 ll. 22–26.

Claim 1 of the '448 Patent recites:

1. A method performed by a host device for establishing a synchronized browsing session between the host device and an invitee device, comprising:

sending a request to establish the synchronized browsing session to a synchronization server;

receiving a confirmation message from the synchronization server including a session identifier generated by the synchronization server, wherein the session identifier is associated with the host device and the established synchronized browsing session;

sending an invitation to an invitee device to join the synchronized browsing session, wherein the invitation includes the session identifier;

recording a shared web browsing interaction responsive to determining that a web browsing interaction of the host device within a web browsing window is a sharable web browsing interaction;

sending a request for webpage content to a website server independent of the synchronization server;

subsequent to sending the request for webpage content to the website server, transmitting information related to the shared web browsing interaction to the synchronization server,

wherein the information related to the shared web browsing interaction is to be processed by a browser of the invitee device and enables the invitee device to generate a request to retrieve a substantially the same webpage content as the request for the webpage content from the host device;

wherein the synchronization server transmits the information related to the shared web browsing interaction to the invitee device in response to receiving the information related to the shared web browsing interaction from the host device, and

wherein the invitee device retrieves data from the website server in response to receiving the information related to the shared web browsing interaction from the synchronization server, the data associated with the webpage content requested by the host device and the information related to the shared web browsing interaction; and

receiving, responsive to sending the request for webpage content to the website server and after transmitting the information related to the shared web browsing interaction to the synchronization server, the requested webpage content from the website server.

*Id.* at col. 23 l. 30 to col. 24 l. 8.

B.    The Accused Products

The undisputed facts as to the Accused Products are as follows. TurboTax Online is Intuit's cloud-based tax-preparation service. ECF No. 302 ¶ 6. TurboTax Live is Intuit's assisted tax-preparation service, which combines TurboTax Online's tax-preparation service with on-demand access to credentialed tax professionals ("TurboTax agents"). *Id.* ¶¶ 7–8.

The Accused Products allow a TurboTax agent's browser to render a view of a TurboTax customer's browser display through a cobrowsing feature that Samesurf accuses of infringing the '448 patent. *Id.* ¶ 9. During a cobrowsing session, the TurboTax agent has limited ability to interact with the TurboTax webpage, where he or she can only scroll, point with a cursor, click to highlight a link or user interface control such as a button or textbox, or drag to create a box to highlight an area of the webpage. *Id.* ¶ 10. In contrast,

during a cobrowsing session, the TurboTax customer cannot perform the action of clicking to highlight a link or user interface control or dragging to create a box to highlight an area of the webpage. *Id.* ¶ 11.

Within a cobrowsing session, a TurboTax customer can navigate and interact with the TurboTax webpage for, by example, clicking links, filling in and submitting forms, activating a dropdown menu and selecting options from it, watching embedded videos, executing searches, navigating to different pages within the website, and downloading files. *Id.* ¶ 12. In contrast, within a cobrowsing session, a TurboTax agent cannot interact with the TurboTax webpage by clicking links, filling in and submitting forms, activating a dropdown menu and selecting options from it, watching embedded videos, executing searches, navigating to different pages within a website, and downloading files. *Id.* ¶ 13.

C.    Procedural History

On March 29, 2022, Samesurf filed a complaint against Intuit, alleging infringement of the '448 Patent, U.S. Patent No. 9,185,145 ("the '145 Patent"), and U.S. Patent No. 8,527,591 ("the '591 Patent") (collectively "the Asserted Patents"). Compl. (Mar. 29, 2022), ECF No. 1. In the complaint, Samesurf alleges that Intuit infringes the Asserted Patents by utilizing Samesurf's patented co-browsing technology as part of Intuit's TurboTax Online, QuickBooks Online, TurboTax Live, QuickBooks Live, Smartlook, and other co-browsing enabled Intuit products. *See* Compl., ECF No. 1 ¶¶ 47-49, 87-208.

On December 16, 2022, Intuit filed *inter partes* review ("IPR") petitions with the Patent Trial and Appeal Board ("PTAB") challenging all the claims in the Asserted Patents: IPR2023-00339, IPR2023-00341, and IPR2023-00342. ECF No. 59 at 2. On January 10, 2023, the Court denied Intuit's motion to dismiss Samesurf's complaint on the grounds that the Asserted Claims are invalid under 35 U.S.C. § 101. ECF No. 27. On January 24, 2023, Intuit filed an answer to Samesurf's complaint, ECF No. 28, and, on March 13, 2023, the Court issued a scheduling order for the action. ECF No. 35.

On June 28, 2023, the PTAB granted Intuit's IPR petitions and instituted IPR proceedings as to all the claims in the Asserted Patents. ECF No. 59 at 2. On June 30, 2023,

3:22-cv-412-RSH-DDL

the Court granted the parties' joint motion to stay the action pending the IPR proceedings. ECF No. 60.

On June 25, 2024, the PTAB issued Final Written Decisions ("FWD") in the IPR proceedings, finding that claims 1–16 of the '448 Patent are not unpatentable [ECF No. 61-3 at 63], but that all the claims of the '145 and '591 Patents are unpatentable as obvious under 35 U.S.C. § 103 [ECF Nos. 61-1 at 1, 5, 62 at 2]. In light of the PTAB's decisions, Samesurf agreed to withdraw both the '145 and the '591 Patents from this action when the IPR stay was lifted. ECF No. 61-1 at 5; *see* ECF No. 64 at 4. On October 7, 2024, the Court granted Samesurf's motion to lift the stay. ECF No. 64. On October 23, 2024, the Court issued an amended scheduling order. ECF No. 72.

On May 2, 2025, the Court issued a claim construction order construing the disputed claim terms from the '448 Patent. ECF No. 109. On April 7, 2026, the United States Court of Appeals for the Federal Circuit affirmed the PTAB's decision upholding the validity of the claims of the '448 Patent. ECF No. 305; ECF No. 305-1, Ex. A. By the present motion, Intuit moves for summary judgment of non-infringement as to the '448 Patent based on the following three grounds: (1) the Accused Products do not satisfy the "synchronized browsing session" claim limitation; (2) the Accused Products do not satisfy the "send[] an invitation" claim limitation; and (3) the Accused Products do not satisfy the "invitee device" claim limitation. *See* ECF No. 252 at 1–3, 14–30. In addition, Intuit argues that it is entitled to partial summary judgment of non-infringement under the doctrine of equivalents as to the ordering of steps claim limitation. *See id.* at 2–3, 30–32.

## II.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are facts that, under the governing substantive law, may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477

7

3:22-cv-412-RSH-DDL

U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex*, 477 U.S. at 323. A moving party without the ultimate burden of proof at trial can satisfy its burden in two ways: (1) by presenting "evidence negating an essential element of the nonmoving party's claim or defense"; or (2) by demonstrating "that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party establishes the absence of a genuine dispute as to any material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv.*, 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); *accord Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." *Anderson*, 477 U.S. at 256; *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed." *Id.* Further, the court may consider other materials in the record not cited by the parties, but it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3); *see also*

*Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010) ("[A] district court has no independent duty 'to scour the record in search of a genuine issue of triable fact.'").

### B.    Patent Infringement

A patent infringement analysis proceeds in two steps. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1320 (Fed. Cir. 2003). In the first step, the court construes the asserted claims as a matter of law. *See id.* In the second step, the factfinder compares the properly construed claims to the accused devices. *See id.*

"'The patentee bears the burden of proving infringement by a preponderance of the evidence.'" *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011); *see Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 193 (2014) ("A patentee ordinarily bears the burden of proving infringement."). "To prove infringement, the plaintiff bears the burden of proof to show the presence of every element or its equivalent in the accused device." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011); *accord Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011).

"'Infringement, whether literal or under the doctrine of equivalents, is a question of fact.'" *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015) (quoting *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129–30 (Fed. Cir. 2011)). "Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents." *Id.*; *see EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1201 (Fed. Cir. 2014).

### C.    Claim Construction

Because the first step in an infringement analysis is for the Court to construe the asserted claims as a matter of law, the Court sets forth the following legal standards governing claim construction. Claim construction "is exclusively within the province of the court [to decide]," not the jury. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370,

373 (1996); *see Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015) (holding claim construction is an issue of law for the court to decide). Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary." *Teva*, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted). "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)); *accord Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1369 (Fed. Cir. 2022).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. "In some cases, the ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." *O2 Micro*, 521 F.3d at 1360. If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'" *Id.* (quoting *Innova*, 381 F.3d at 1116); *see Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

///

3:22-cv-412-RSH-DDL

In determining the proper construction of a claim, a court should first look to the language of the claims. *See Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim language itself'"). The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term. *See Phillips*, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979; *see* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

But "[t]he written description part of the specification does not delimit the right to exclude.  That is the function and purpose of claims." *Markman*, 52 F.3d at 980. Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012); *accord Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 514 (Fed. Cir. 2015).

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence. *Phillips*, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." *Id.* "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final

product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* In addition, a court should also consult the prosecution history "so that the court can exclude any interpretation that was disclaimed during prosecution." *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1317).

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583; *Teva*, 574 U.S. at 331; *see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting *Phillips*, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. *Phillips*, 415 F.3d at 1319. "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'" *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." *Teva*, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro*, 521 F.3d at 1362; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'"). In certain situations, it is appropriate for a court to determine

3:22-cv-412-RSH-DDL

that a claim term needs no construction and its plain and ordinary meaning applies. *O2 Micro*, 521 F.3d at 1360; *Phillips*, 415 F.3d at 1314. But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361. If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. *Id.* at 1362; *Eon*, 815 F.3d at 1319.

### III.    INTUIT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '448 PATENT

In its motion for summary judgment, Intuit argues that it is entitled to summary judgment of non-infringement of the '448 Patent because the Accused Products do not satisfy the "synchronized browsing session" claim limitation in the Asserted Claims as construed by the Court. *See* ECF No. 252 at 14–18. In response, Samesurf argues that the expert report from its technical expert, Dr. Friedman, is sufficient to create a genuine issue of material fact as to whether Intuit's Accused Products satisfy the "synchronized browsing session" claim limitation as construed by the Court. *See* ECF No. 276 at 3–5.

All of the Asserted Claims in this action recite the limitation of a "synchronized browsing session." ECF No. 302 ¶¶ 2–3; *see* '448 Patent col. 23 l. 30 to col. 26 l. 25. In the Court's claim construction order, the Court construed the term "synchronized browsing session" as "a browsing session administered by the synchronization server in which the host device and the invitee device have substantially the same fully interactive browsing experience in a simultaneous or nearly simultaneous real-time manner." ECF No. 109 at 18–19. The Court's construction of "synchronized browsing session" was based on the PTAB's construction during the IPR proceedings, but then modified to incorporate disclaimers contained in the specification and the prosecution history. *See id.* at 10–18.

///

///

///

A.    Clarification of the Court's Construction of "synchronized browsing session"

Before addressing whether there is a genuine issue of material fact as to whether the Accused Products satisfy the "synchronized browsing session" limitation, the Court must first address a dispute that has arisen between the Parties regarding the proper scope of the Court's construction of this term. *See Niazi*, 30 F.4th at 1350–51 (explaining that determining the proper scope and meaning of the claims via claim construction is the first step in an infringement analysis).

In its briefing, Intuit contends that, under the Court's construction of "synchronized browsing session," the host device and the invitee device must have substantially the same fully interactive browsing experience (i.e., both devices must be able to fully interact with the webpage in the same manner). *See* ECF No. 252 at 14–18; ECF No. 247-1 at 4–9; ECF No. 267 at 1–20; ECF No. 290 at 1–6, 13–22. In response, Samesurf contends that the Court's construction only requires that the host device and the invitee device both be able to interact in some way with the same internet content. *See* ECF No. 276 at 6–12; ECF No. 246 at 1–15; ECF No. 268 at 1–14; ECF No. 296 at 1–9. Put another way, Samesurf contends that the Court's construction does not specifically require that the host device and the invitee device have substantially the same type and level of fully interactive experience (or words to that effect). *See id.* Further, in one of its *Daubert* motions, Samesurf requests that the Court provide a derivative construction of "synchronized browsing session" to resolve this dispute between the parties and their experts. *See* ECF No. 246 at 2, 7–15; ECF No. 296 at 8–9. Thus, despite the Court's best efforts to resolve any claim construction disputes between the Parties during the claim construction phase of this case, a clear dispute regarding the proper scope of "synchronized browsing session" as that term has been construed by the Court remains between the Parties.

The Federal Circuit has explained that "a district court may (and sometimes must) revisit, alter, or supplement its claim constructions . . . to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact." *In re Papst Licensing Digit. Camera Pat. Litig.*, 778 F.3d 1255, 1261

14

(Fed. Cir. 2015); *see also Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1373 (Fed. Cir. 2012) ("[I]n . . . cases in which the correct construction of a claim term necessitates a derivative construction of a non-claim term, a court may perform the derivative construction in order to elucidate the claim's meaning."). Further, when the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. *O2 Micro*, 521 F.3d at 1362; *Eon*, 815 F.3d at 1319; *see Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) ("[A] court must see to it that disputes concerning the scope of the patent claims are fully resolved."). As such, the Court will clarify its construction of "synchronized browsing session" to resolve the Parties' present dispute.

The Court's construction of "synchronized browsing session" requires, among other things, that "the host device and the invitee device have substantially the same fully interactive browsing experience." ECF No. 109 at 18–19. The Court clarifies for the Parties that it was the Court's intention that this construction requires that the host device and the invitee device have substantially the same type of fully interactive experience with the same internet content during the synchronized browsing session. This meaning is well supported by the intrinsic record.[1]

The '448 Patent's specification describes the "synchronized browsing session" of the claimed invention and explains:

---

[1] In an effort to assert that the Court's claim construction does not mean what it says, Samesurf relies on the rules of grammar and contends that the Court's claim construction contains "coordinate adjectives" (i.e., "words used in a sequence to modify the same noun"). ECF No. 246 at 4–6; ECF No. 276 at 7 n.2, 10-11 & n.7; ECF No. 296 at 4–6. The Court disagrees. Intuit correctly explains that the Court's claim construction uses "cumulative adjectives" (i.e., adjectives that "build on one another in sequence, with each successive modifier applying to the entire noun phrase that follows it"). ECF No. 267 at 4–6; ECF No. 290 at 2. Further, apart from Samesurf's grammatical argument, the Court knows what it intended in drafting the claim construction at issue; the Court provides the requested clarification herein and explains why this clarification is supported by the intrinsic record and claim construction principles.

> The present invention allows two or more persons browsing the internet to share their internet browsing experience and have all users simultaneously browse and fully interact with web sites, games, virtual worlds, or other online applications in real time. . . . In a synchronized browsing session, two or more people may read the same article, watch the same video, or shop for the same item automatically, without the hassle of coordinating user input. . . .
>
> In the current art, should two or more people, on different devices, attempt to book an airline flight through an internet website, each person would be separately required to input identical information such as destination, date of departure, or date of arrival into their respective browser. Coordination of such data input is often difficult to accomplish and input errors can lead to conflicting search results. In a synchronized browsing session utilizing the present invention, however, such data input is automatically formatted, forwarded and inputted into the other devices, thereby allowing all persons to view, book, and alter the same flight results. Further activities may include, but are not limited to, enabling session attendees to shop, book travel, view or listen to media, chat, audio and video conference, screen share, screen draw, stay connected to contacts in order to send invites and chat with those not currently in the experience, detect online friends, and otherwise browse and fully interact in a shared browsing experience. As such, utilization of the present invention facilitates the initialization and implementation of a synchronized browsing session between two or more internet users, thereby allowing all of them to view and fully interact with the same internet content without the hassle of coordinated user input.

'448 Patent col. 5 ll. 22–61.

In the above passage, the specification is broadly describing "the present invention" of the '448 Patent and explains that in a synchronized browsing session "all users" (i.e., both the host device and the invitee device) are allowed to "fully interact with [the] web sites." *Id.* at col. 5 ll. 24–25; *see also id.* at col. 2 ll. 48–54 ("[T]here is a need for a device that allows all users in a session to interact with, discuss, log in separately or together, and share internet browsing in real time for online activities such as shopping together, booking travel together, watching or listening to media together, and browsing the internet together in a simultaneous fashion from different devices and/or locations."), col. 2 ll. 8–12 ("[T]he

current art lacks technology that would simultaneously connect two or more users in a medium that would allow all of them to both interact with one another and with the content itself in real time and in a synchronized or shared fashion.").

Further, in an effort to distinguish the claimed invention from prior art systems, the specification states that "[i]n a synchronized browsing session utilizing the present invention," "all persons" are able to "book" or "alter the same flight results" without coordinating input data. *Id.* at col. 5 ll. 39–49. This language clearly supports the understanding that both the host device and the invitee device are able to fully interact with the same internet content in substantially the same way because, in this disclosure of the claimed invention, "all persons" (i.e., both the host device and the invitee device) are able to fully interact with the webpage in substantially the same manner: they are all able to take the necessary actions to book or alter the same flight results without the need for coordinating user input. *See id.*; *see also id.* col. 2 ll. 48–50 ("there is a need for a device that allows all users in a session to interact with . . . internet browsing"). Further, that the specification explains that this can be performed without the need for coordinating user input is notable because, if the two users (i.e., the host device and the invitee device) are not able to interact with a webpage in substantially the same way, then the users would need to coordinate user input for all of them to book the same flight or alter the flight results.

Importantly, in the portion of the specification above, the specification is not describing a mere preferred embodiment. Rather, the specification is describing "the present invention" of the patent. '448 Patent col. 5 ll. 22, 35, 46,57. "When a patentee 'describes the features of the 'present invention' as a whole,' he implicitly alerts the reader that 'this description limits the scope of the invention.'" *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (quoting *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013)); *accord Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015); *see, e.g., Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) ("It is axiomatic that, where

3:22-cv-412-RSH-DDL

the specification 'describes "the present invention" as having [a] feature,' that representation may disavow contrary embodiments."). Further, in these passages the specification is distinguishing the disclosed "synchronized browsing session" from the prior art. *See Poly-America, L.P. v. API Indus., Inc.,* 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[A]n inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature . . . . Similarly, an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature."). The Court's construction of "synchronized browsing session" encompasses the scope of the invention as set forth in the specification, which requires that all users are capable of fully interacting with the same internet content.

Samesurf notes that the PTAB's construction of "synchronized browsing session" did not include the phrase "fully interactive," and that the Court based its construction initially on the PTAB's construction. *See* ECF No. 246 at 5, 11, 13–15; ECF No. 276 at 11 n.8. Samesurf is correct that the PTAB's construction of "synchronized browsing session" did not include the phrase "fully interactive." *See* ECF No. 100-1, Friedman Decl., Ex. C at 17. But the Court adopted the PTAB's construction for this term only as a starting point. The Court modified the PTAB's construction in order to properly encompass the disclaimers contained in the specification and the prosecution history – one of which is the requirement that the users of the synchronized browsing session have substantially the same fully interactive experience. *See* ECF No. 109 at 10–19.

Further, Samesurf's contention that the term "browsing experience" refers only to "what is shown on the display (i.e., host and invitee devices see 'substantially the same' content or web page)," ECF No. 246 at 1; *see id.* at 11–14; ECF No. 276 at 7 n.3, is inconsistent with the '448 Patent specification. The specification, in multiple places, describes what it considers to be a "shared browsing experience," and clearly states that a shared browsing experience encompasses not only "browsing" (i.e., viewing the same internet content) but also all users being able to "fully interact" with that internet content.

*See, e.g.,* '448 Patent col. 5 ll. 55–56 ("browse and fully interact in a shared browsing experience"), col. 5 ll. 22–26 ("The present invention allows two or more persons browsing the internet to share their internet browsing experience and have all users simultaneously browse and fully interact with web sites, games, virtual worlds, or other online applications in real time."), col. 5 ll. 45–49 ("In a synchronized browsing session utilizing the present invention, however, such data input is automatically formatted, forwarded and inputted into the other devices, thereby allowing all persons to view, book, and alter the same flight results."), col. 2 ll. 45–55 ("There is a need in the art for . . . real time sharing of a more complete internet experience. Specifically, there is a need for a device that allows all users in a session to interact with, discuss, log in separately or together, and share internet browsing in real time for online activities such as shopping together, booking travel together, watching or listening to media together, and browsing the internet together in a simultaneous fashion from different devices and/or locations.").

To support its claim construction position, Samesurf again relies on the specification's description of leading and following devices. *See* ECF No. 296 at 3 (citing '448 Patent col. 7 ll. 19–21). Nevertheless, as previously explained in the Court's claim construction order, the specification's description of leading and following devices is consistent with the Court's claim construction. *See* ECF No. 109 at 16 n.3. The specification, when giving an example of an interaction that a following participant/device can take, states: "having following participants click on links that open in new non-shared tabs." '448 Patent col. 5 ll. 65–66. Thus, under this description contained in the specification, even when a device is a following device it is still able to fully interact with the relevant internet content.

In addition, Samesurf notes that the specification of the '448 Patent includes an embodiment where "host device 10 may limit or restrict functionality available to guest devices in synchronized browsing software 16 during a synchronized browsing session." ECF No. 246 at 14 (citing '448 Patent col. 22 ll. 8–15). This passage is not inconsistent with the Court's construction. In this portion of the specification, the specification explains

that the synchronized browsing software embodiment can provide the host device with the ability to limit or restrict guest device functionality that would otherwise be "available." '448 Patent col. 22 ll. 13-15; *see also id.* col. 22 ll. 9–12 ("[A]ttendee list 73 provides for mute, sound level and other audio and video control capabilities, including options to add, remove, or otherwise disable specific functionality for the user of synchronized browsing software 16."). Thus, the specification clearly states that the functionality at issue is still "available" even in that embodiment. Under the Court's construction, the "synchronized browsing session" need only be capable of allowing the host device and the invitee device to both fully interact with the same internet content. *See* ECF No. 109 at 14–15 & n.2. The Court's construction does not prohibit the host device from limiting "available" functionality provided that the functionality is still available within the system absent the host device actively imposing a functionality limitation.

In an effort to support its proposed derivative claim construction, Samesurf also contends that the specification of the '448 Patent includes a special definition for the term "fully interact with." *See* ECF No. 246 at 1, 11–15; ECF No. 268 at 10–13; ECF No. 276 at 4–5; ECF No. 296 at 2–4. This lexicography argument recognizes that Samesurf's proposed derivative claim construction does not comport with the plain and ordinary meaning of the phrase "fully interact with," which generally means to allow communication between a user and a computer/computer program to the greatest degree or extent possible. *See* COLLINS DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english/fully ("Fully means to the greatest degree or extent possible."); MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/fully#dictionary-entry-1 (defining "fully" as "in a full manner or degree"); COLLINS DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english/interactive ("An interactive computer program or electronic device is one that allows direct communication between the user and the machine."); MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/interactive (defining "interactive" as "a two-way electronic communication system (such as a

telephone, cable television, or a computer) that involves a user's orders (as for information or merchandise)").

A patentee "may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Alnylam Pharms., Inc. v. Moderna, Inc.*, 138 F.4th 1326, 1333 (Fed. Cir. 2025) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (explaining that a patentee setting out a definition and acting as his own lexicographer is an exception to the general rule that plain and ordinary meaning should govern). The Federal Circuit has explained that the standard for lexicography is "exacting." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). "'To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "clearly express an intent to redefine the term.'" *Hill-Rom*, 755 F.3d at 1371 (quoting *Thorner*, 669 F.3d at 1365.). "[T]he intrinsic evidence must clearly set forth or clearly redefine a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." *Alnylam*, 138 F.4th at 1333. But "no magic words" need be used. *Hill-Rom*, 755 F.3d at 1373.

The relevant portion of the specification relied on by Samesurf to support its lexicography argument is as follows:

> [U]tilization of the present invention facilitates the initialization and implementation of a synchronized browsing session between two or more internet users, thereby allowing all of them to view and fully interact with the same internet content without the hassle of coordinated user input. For purposes of this discussion, the term, "fully interact with" may comprise, but is not limited to: (1) logging into or registering at certain sites or applications; (2) filling in form data; (3) performing multiple queries; (4) having following participants click on links that open in new non-shared tabs; (5) playing online games; (6) visiting virtual worlds; or (7) "drawing" on the screen and simultaneously

3:22-cv-412-RSH-DDL

> transmitting those figures, annotations, or markups to other users in the session.

'448 Patent col. 5 l. 56 to col. 6 l. 3.

The above passage is insufficient to set forth a clear intent to redefine the term "fully interactive" in the manner proposed by Samesurf. Samesurf interprets the above passage to mean that a user is able to "fully interact with" internet content, so long as the user is able to do just one of the seven listed actions. *See* ECF No. 246 at 15; ECF No. 276 at 4–5. That is not what that passage is saying. Rather, the passage is merely providing a list of examples of what kinds of actions a device might be able to perform during a "fully interactive" synchronized browsing session depending on the internet content at issue.[2] *See also* EF No. 267 at 19–20; ECF No. 290 at 3–5. The passage does not state that any single item by itself, excluding the others, would be sufficient to constitute "fully interacting" with a website. Further, Samesurf's interpretation of this passage is inconsistent with many other passages in the specification. For example, under Samesurf's proposed definition, a cobrowsing system that only allows users to draw on the computer screen and then transmit those drawings to other users but allows for no other user functionality/interactivity would constitute a "synchronized browsing session." *See* ECF No. 268 at 13. But this is clearly insufficient to constitute a "synchronized browsing session" under the many other disclosures in the specification. *See* '448 Patent col. 5 ll. 45–49 ("In a synchronized browsing session utilizing the present invention, however, such data input is automatically formatted, forwarded and inputted into the other devices, thereby allowing all persons to view, book, and alter the same flight results."), col. 5 ll. 31–33 ("In a synchronized

---

[2] That this portion of the specification is providing a non-exhaustive list of examples of what types of actions a device might be able to perform during a "fully interactive" synchronized browsing session makes sense because different webpages allow for different levels of interactivity. Some webpages have hyperlinks that a user can click on to open a new page, or fields for users to fill in with data, or online games that users can play; but other webpages do not. Thus, what it means to "fully interact" with a website (internet content) will vary depending on the particular capabilities of the website at issue.

browsing session, two or more people may read the same article, watch the same video, or shop for the same item."). If all users can do is draw boxes, then they are not able to book or alter flight results or shop for the same item – actions the specification clearly states a user is capable of performing during a synchronized browsing session. *See id.* As such, the Court rejects Samesurf's lexicography argument, and the Court instead gives the phrase "fully interactive" within its claim construction its plain and ordinary meaning.[3]

Finally, Samesurf contends that "if the host device and the invitee device must be substantially the same with respect to the level and kind of interactivity, the system itself would become inoperable." ECF No. 246 at 6. Samesurf contends that giving all users of

---

[3] The Court notes that during the claim construction phase of this case, Intuit proposed a construction of "synchronized browsing session" that included the phrase "fully interact with" within the proposed construction. ECF No. 96-1 at 1; ECF No. 99 at 5. In addition, prior to the claim construction hearing in this case, the Court provided the parties with a tentative claim construction order in an effort to guide the parties' arguments during the claim construction hearing. The Court's tentative claim construction order set forth a tentative construction of the claim term "synchronized browsing session" that included the phrase "fully interactive browsing experience." Moreover, during the claim construction hearing, the potential meaning of the phrase "fully interactive" was expressly discussed by Samesurf. *See* ECF No. 345 at 16–17 (Samesurf stating "[T]he other issue we have with adding 'fully interactive' is . . . : What exactly does that mean?"). However, at no time during the claim construction phase of this case did Samesurf ever make a lexicography argument and contend that the '448 Patent's specification contains a special definition for the term "fully interact with." *See generally* ECF Nos. 96-1, 100, 103-1; ECF No. 345. As such, this lexicography argument was also waived by Samesurf. *See Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("The district court found that ACS waived any argument with respect to th[e] term ['maintaining'] by failing to raise it during the claim construction phase. We agree."); *CliniComp Int'l, Inc. v. Cerner Corp.*, No. 17CV02479GPCDEB, 2022 WL 16985003, at *9 (S.D. Cal. Nov. 15, 2022) ("[G]enerally, a party waives any argument with respect to the construction of a claim term when they fail to raise that issue during the claim construction phase of the case."); *Polaris PowerLED Techs., LLC v. Samsung Elecs. Am., Inc.*, No. 2:22-CV-00469-JRG-RSP, 2024 WL 5098226, at *2 (E.D. Tex. Dec. 12, 2024) ("a 'failure to timely raise . . . claim construction arguments should ordinarily result in waiver of the arguments'"); *Maquet Cardiovascular LLC v. Abiomed, Inc.*, No. CV 17-12311-FDS, 2026 WL 1244810, at *3 (D. Mass. May 6, 2026) (same).

3:22-cv-412-RSH-DDL

a cobrowsing system the same level of interactivity would purportedly lead to a "tug of war" issue. *Id.* The Court does not find this argument persuasive. The '448 Patent's specification explains that the present invention encompasses a scenario where "all persons" during "a synchronized browsing session" are able to input information and "book" or "alter the same flight results" without coordinating input data. '448 Patent col. 5 ll. 39–49. Samesurf has not adequately explained to the Court why this system, expressly described in the specification, would be inoperable.

In sum, the Court reaffirms its construction of "synchronized browsing session" as "a browsing session administered by the synchronization server in which the host device and the invitee device have substantially the same fully interactive browsing experience in a simultaneous or nearly simultaneous real-time manner." The Court clarifies that the modifier "substantially the same" modifies both the adjective "fully interactive" and the noun "browsing experience." In addition, the Court clarifies that the phrase "fully interactive" within the Court's construction carries its plain and ordinary meaning which is in a manner that allows communication between a user and a computer/computer program to the greatest degree or extent possible.

## B.    Non-Infringement

With that clarification of Court's prior claim construction resolved, the Court turns to whether, in light of that claim construction, there is a genuine issue of material fact as to whether the Accused Products satisfy the "synchronized browsing session" limitation in the asserted claims. Again, all of the asserted claims in this action include the claim limitation of a "synchronized browsing session." And the Court has construed "synchronized browsing session" as "a browsing session administered by the synchronization server in which the host device and the invitee device have substantially the same fully interactive browsing experience in a simultaneous or nearly simultaneous real-time manner," with the added clarifications that the modifier "substantially the same" modifies both the adjective "fully interactive" and the noun "browsing experience," and

that the phrase "fully interactive" within the Court's construction carries its plain and ordinary meaning.

With respect to the Accused Products at issue in this action, the undisputed facts are as follows. During the accused cobrowsing session, a TurboTax agent has limited ability to interact with the TurboTax webpage, where he or she can only scroll, point with a cursor, click to highlight a link or user interface control such as a button or textbox, or drag to create a box to highlight an area of the webpage. ECF No. 302 ¶ 10; *see also* ECF No. 276-1, Ex. 1, Friedman Report ¶¶ 188, 190; ECF No. 281-3, Ex. 2. In contrast, during the accused cobrowsing session, the TurboTax customer (unlike the agent) cannot perform the action of clicking to highlight a link or user interface control or dragging to create a box to highlight an area of the webpage. ECF No. 302 ¶ 11. Within the accused cobrowsing session, a TurboTax customer can navigate and interact with the TurboTax webpage by, for example, clicking links, filling in and submitting forms, activating a dropdown menu and selecting options from it, watching embedded videos, executing searches, navigating to different pages within the website, and downloading files. *Id.* ¶ 12; *see also* ECF No. 276-1, Ex. 1, Friedman Report ¶ 190. In contrast, within the accused cobrowsing session, the TurboTax agent (unlike the customer) cannot interact with the TurboTax webpage by clicking links, filling in and submitting forms, activating a dropdown menu and selecting options from it, watching embedded videos, executing searches, navigating to different pages within a website, and downloading files. ECF No. 302 ¶ 13.

Under the above undisputed facts, no reasonable juror could conclude that the Turbo Tax agent and the Turbo Tax customer have substantially the same fully interactive browsing experience during the accused browsing session. The undisputed facts show that the TurboTax agent and the TurboTax user have meaningfully different browsing experiences in light of the different levels and types of interactivity provided to each. The TurboTax agent can highlight text and draw boxes while the TurboTax customer cannot perform those functions. ECF No. 302 ¶¶ 10–11. The TurboTax customer can navigate the

3:22-cv-412-RSH-DDL

website in various ways, including by clicking on links, and can fill in and submit forms, but the TurboTax agent cannot perform those functions. *Id.* ¶¶ 12–13.

In addition, under the above undisputed facts, no reasonable jury could conclude that all users of the accused system are *capable* of having a fully interactive browsing experience. In the accused cobrowsing system, the TurboTax agent can only scroll, point with a cursor, highlight items, or draw a highlighted box. ECF No. 302 ¶ 10. The TurboTax agent cannot click links, fill in or submit forms, activate a dropdown menu or select options from it, watch embedded videos, execute searches, navigate to different pages within a website, or download files. ECF No. 302 ¶ 13. In light of these undisputed facts, no reasonable juror could conclude that, in the accused system, the Turbotax agent is able to have a "fully interactive browsing experience" with the internet content at issue. Rather, the undisputed evidence shows that the TurboTax agent has a limited browsing experience via the Accused Products. In sum, based on the undisputed facts in the record, no reasonable juror could conclude that the accused system satisfies the "synchronized browsing session" claim limitation.

Samesurf contends that the expert report from its infringement expert, Dr. Friedman, is sufficient to create a genuine issue of material fact here because Dr. Friedman opines that the Accused Products satisfy the Court's construction of the term "synchronized browsing session." *See* ECF No. 276 at 3–5 (citing ECF No. 276-1, Ex. 1, Friedman Report ¶¶ 181–92). However, in its briefing, Samesurf concedes that Dr. Friedman's infringement opinions as to "synchronized browsing session" are based on his understanding of the Court's claim construction and that his understanding is that the terms "substantially the same" and "fully interactive" should be treated as paired adjectives that independently modify the noun "experience" and that the specification includes a special definition for the term "fully interact with" that is different from the plain and ordinary meaning of that term. ECF No. 246 at 8; *see* ECF No. 276 at 4–10. As explained in the prior section, this is an incorrect understanding of the Court's construction of the term "synchronized browsing session" and one that contradicts the intrinsic record. *See supra* Order § V.A. As

Samesurf itself notes in one of its *Daubert* motions, when "an expert's testimony is based on an 'incorrect understanding of the claim construction,' the Court 'must disregard the testimony.'" ECF No. 246 at 2–3 (quoting *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011)); ECF No. at 296 at 7. Because Dr. Friedman's expert opinions regarding the "synchronized browsing session" claim limitation are based on such an incorrect understanding, the Court must disregard Dr. Friedman's opinions. *See Cordis*, 658 F.3d at 1357; *Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709, 715 (Fed. Cir. 2022); *Little Giant Ladder Sys., LLC v. Tricam Indus., Inc.*, No. 2024-2115, 2026 WL 305021, at *5–6 (Fed. Cir. Feb. 5, 2026); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("No party may contradict the court's construction to a jury."). As such, the opinions in Dr. Friedman's expert report are insufficient to raise a genuine dispute of material fact as to whether the Accused Products satisfy the "synchronized browsing session" limitation.

In sum, under the Court's construction of the term "synchronized browsing session" and the undisputed facts in the record regarding the functionality of the Accused Products, no reasonable juror could conclude that the Accused Products satisfy the "synchronized browsing session" limitation in the asserted claims. Accordingly, Intuit is entitled to summary judgment of non-infringement as to all of the Asserted Claims of the '448 Patent, and the Court grants Intuit's motion for summary judgment of non-infringement.[4]

---

[4] In its motion for summary judgment, Intuit also argues that it is entitled to summary judgment of non-infringement because the Accused Products do not satisfy the "send[] an invitation" claim limitation and the Accused Products do satisfy the "invitee device" claim limitation. *See* ECF No. 252 at 1–2, 18–30. Intuit also moves for partial summary judgment that there is no infringement under the doctrine of equivalents as to the order of steps limitation. *See id.* at 30–32. Because the Court grants Intuit's motion for summary judgment of non-infringement on the above grounds, these additional grounds for summary judgment are not moot, and the Court declines to address them.

Finally, in light of the issues raised by Intuit's motion, and the Court's familiarity with questions of claim construction from the prior briefing and claim construction hearing, the Court finds this motion suitable for disposition without oral argument.

3:22-cv-412-RSH-DDL

## IV.   REMAINING PENDINGS MOTIONS

In addition to Intuit's motion for summary judgment of non-infringement, currently pending before the Court are the parties' *Daubert* motions; Samesurf's motion to exclude Dr. Macartney's errata; the parties' motions in limine; and Samesurf's motion for potential trial dates. ECF Nos. 240, 243, 246, 247, 250, 266, 317, 323, 326, 327, 328, 329, 330, 332, 335, 336, 337, 338, 341. Because the Court grants Intuit's motion for summary judgment of non-infringement, the Court denies all of these remaining pending motions as moot.

## V.   CONCLUSION

For the reasons above, the Court grants Intuit's motion for summary judgment that the Accused Products do not infringe any of the asserted claims of the '448 Patent. In addition, the Court denies as moot the parties' *Daubert* motions; Samesurf's motion to exclude Dr. Macartney's errata; the parties' motions in limine; and Samesurf's motion for potential trial dates. The Clerk is directed to enter judgment in favor of Defendant Intuit and against Plaintiff Samesurf and close the case.

**IT IS SO ORDERED**.

Dated:  May 28, 2026

*Robert S Huie*
_____
Hon. Robert S. Huie
United States District Judge